UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Reina Hughes, | ) | Civil Action No. 4:04-875-TLW-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | REPORT AND |
| | ) | RECOMMENDATION |
| Conway Hospital, Inc. and John Brown, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

In this action, plaintiff alleges that she was involved in a sexual relationship with a supervisor, John Brown, against her will. She brought this action against her employer, Conway Hospital, Inc. (Hospital) and John Brown (Brown). In her amended complaint filed August 17, 2004, she alleges causes of action against the Hospital for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* for a sexually hostile work environment, for discrimination in the form of failure to promote and the terms and conditions of her employment based upon retaliation, national origin and gender, as well as several state law causes of action against Brown. The facts, in the light most favorable to the plaintiff, are set forth below.

**Facts**[1]

Plaintiff, Reina Hughes, is a native of El Salvador and has lived in the United States for 18 years. She was hired by Conway Hospital (Hospital) as a housekeeping employee in August 2001.

---

[1] Local Rule 7.05, D.S.C., requires that facts be presented with reference to the location in the record. Several facts presented in plaintiff's opposition memorandum do not reference locations in the record to support the factual assertions, some reference the complaint or amended complaint as support, and some mischaracterize the record. Pertinent facts presented without record support have not been included.

She was hired to work second shift which began at 3:00 p.m. (Hughes Dep. at 28). She does not remember who her supervisor was when she was hired, but she testified that Nell Johnson was not her supervisor. (Hughes Dep. at 29). Brown was her shift supervisor until September 2002 when Joseph Frazier became her shift supervisor. (Frazier Dep. at 6-7). After September 2002, in Frazier's absence, Brown would fill in for Frazier on occasion. (Hughes Dep. at 90).

Plaintiff asserts that beginning around April 2002, Brown began making sexual related remarks towards her. (Hughes Dep. at 46-48). He told her he wanted to have a sexual relationship with her, but he was married and wanted to remain very quite about it. (Hughes Dep. at 44-45). She testified that she told him she could not do it because she was scared, she was married, and she did not want to have any problems with her job[2]. (Hughes Dep. at 46). Plaintiff testified that on many occasions she refused Brown's requests to have sex with her. (Hughes Dep. at 47-48). She testified that he began "touching her" in about April of 2002 and they began having sex the following July. (Hughes Dep. at 52-53). She testified that they had sex on approximately seven occasions over a six or seven month period. (Hughes Dep. at 59). She testified that they had sex on Hospital property in the laundry room or the same day surgery area. She testified that they had sex in the laundry room on about four occasions and in the same day surgery area on about three occasions. (Hughes Dep. at 58). She also testified that she performed oral sex on him on one occasion in the laundry room. (Hughes Dep. at 67). She testified that Brown has a 11/2 inch scar on one side of his buttocks. (Hughes 61-62).

Plaintiff testified that she refused to have sex with Brown anymore in October 2002.

_____

[2] Plaintiff testified that she was concerned about losing her job, at least in part, because she was helping to provide medication for her parents.

-2-

However, she testified that Brown paged her once in January of 2004 and asked her to meet him in the laundry room which she did not do.  (Hughes Dep. at 158).

Plaintiff testified that she attempted to report Brown to Craig Hyman, Director of Human Resources, but he was on vacation.  She left a message for him to contact her when he returned[3], but he did not contact her until a month or two later.  (Hughes Dep. at 106-08).  She did report Brown to her supervisor, Joseph Frazier. (Hughes Dep. at 102-03)[4].  On July 21, 2003, Larry Foye, the head of the housekeeping department, spoke to plaintiff and told her he heard a rumor that Brown had raped her.  (Hughes Dep. at 109).  The record does not disclose from whom Foye heard this rumor. That day Foye took plaintiff to Craig Hyman.  (Hughes Dep. at 108).[5]  Plaintiff informed Foye that Brown had forced her to have sex with him.  (Hughes Dep. at 108).  She informed them that Brown did not rape her but she had had sex with him and "the situation was out of control."  (Hughes Dep. at 114,118).  She told them that she and Brown had sex one or two times a week for six months.

―――――――――――――

[3]  The record indicates that she left word for Hyman to contact her, but there is no indication that the subject matter about which she wanted to speak to him was relayed.  (Hughes Dep. at 107).

[4]  She testified that she told Joseph Frazier "it was pretty much when it was close to over."  (Hughes Dep. at 102).  It was after they quit having sex and approximately a month before she reported the situation to Craig Hyman.  (Hughes Dep. at 102-03).  She testified that Frazier acted like he did not care.  (Hughes Dep. at 103).

[5]  Plaintiff testified that prior to reporting Brown to Craig Hyman on July 21, 2003, she informed David Russell, Mary (an OB nurse) and Gertrude Smith about Brown's sexual advances.  (Hughes Dep. at 96).  Her conversations with David Russell occurred during the time that she was having sex with Brown.  (Hughes Dep. at 109).  Russell was a non-management coworker in housekeeping.  (Russell Dep. at 4).  She informed Mary and Gertrude Smith of the sexual relationship approximately a month before she met with Craig Hyman.  (Hughes Dep. at 101).  She testified that Mary and Gertrude Smith, co-worker housekeeping employees, told her to call an attorney.  (Hughes Dep. at 101).

(Hughes Dep. at 118). She informed them that Ann Alford was a witness who saw she and Brown go into the laundry room. (Hughes Dep. at 119). She also told them that David Russell saw she and Brown going to one day surgery many times. (Hughes Dep. at 119). Plaintiff told Hyman and Foye that she had an attorney and refused to answer any more of their questions and refused to tell them what actions she wanted them to take. (Hughes Dep. at 113-116). She testified that she refused to answer the questions because she tried to contact Hyman previously and he did not contact her. (Hughes Dep. at 115-116).

Craig Hyman and Foye spoke with the witnesses plaintiff told them would have knowledge of her complaints. After their investigation was finished, they found no wrongdoing on Brown's part[6], but directed plaintiff to notify him or Foye if Brown and plaintiff were ever in a room alone and directed Brown to not enter a room alone with plaintiff. Further, Brown was shifted from second shift to first shift. On July 24, 2003, Hyman and Foye met again with plaintiff and she refused to sign the investigative report and informed them that she just wanted to file the report and did not ask them to take further action at that time. (Hughes Dep. at 134). Plaintiff did tell Foye and Hyman that Bart Haas may have some information about the situation between Brown and plaintiff. (Hughes Dep. at 131). Foye and Hyman interviewed Haas who denied any knowledge about the situation. (Haas Dep. at 7-11).

On August 1, 2003, Foye delivered letters to Brown and plaintiff which read as follows:

> Mrs. Hughes:
> We have completed our investigation of your complaint of harassment from
> John Brown. We talked to the witnesses that you gave us, including Mr.

---

[6] The witnesses plaintiff reported would have knowledge of her allegations denied any knowledge. (Hyman Aff. ¶ 12, 13, 14; Foye Dep. at 14,15; Russell Dep. at 6-7; Alford Dep. at 21-22; Brown Dep. at 13-16).

Brown, and we found that they knew of no harassment that occurred toward you from John.  In light of your complaint, you are not to go into any room or area alone with Mr. Brown.  If he insists on meeting you in a room or are alone, please let either Mr. Foye or myself know as soon as possible.
We would like to thank you for bringing this complaint to us and if you have any more concerns or questions, please don't hesitate to let us know.

Dear Mr. Brown:
In light of the complaint from Reina Hughes, you are not to ask or go into a room or area alone with Reina.  If she insists on meeting you in a room or area, please let either Larry Foye or myself know as soon as possible.
If you have any questions or concerns, please let me know.

(Exh. 26, 27 to Hughes Dep.).

Brown also was permanently assigned to first shift and, thus, not the same hours as plaintiff.

(Hyman Aff. ¶13; Brown Dep. at 24-25; Hughes Dep. at 139-40).

After Hyman and Foye investigated the allegations in July of 2003, Brown did nothing inappropriate towards her, except plaintiff testified that Brown was in a room alone with her on a few occasions after July of 2003 to take her to a room to watch training videos, but nothing inappropriate occurred  (Hughes Dep. at 136) and Brown paged her in January 2004 to meet him in the laundry room.  (Hughes Dep. at ).  Plaintiff made no further complaint about Brown to Foye, Hyman or other appropriate person after July 2003.  (Hughes Dep. at 135-37; Hyman Aff. ¶17).

Brown received several job performance evaluations while employed with Hospital.  On November 6, 2001, Brown completed the 90 Day evaluation of plaintiff's job performance.  The evaluation form allows for a score of "0" to "2" with "0" being below expectations/standards, "1" being meets expectations/standards and "2" being exceeds expectations/standards.  Brown gave plaintiff a score of 1 on 24 of the 43 criteria evaluated and a "2" for the remaining criteria.  (Exh. 6 to Hughes Dep.).

On August 7, 2002, Brown completed an annual evaluation on plaintiff's job performance. Brown gave plaintiff a score of "1" on each of the 43 criteria evaluated. (Exh. 14 to Hughes Dep.).

On August 21, 2003, Joseph Frazier completed an annual evaluation on plaintiff's job performance. Mr. Frazier gave plaintiff a score of "2" on nineteen of the criteria, "1" on sixteen of the criteria, and "0" on 5 of the criteria.. (Exh. 19 to Hughes Dep.).

Plaintiff received disciplinary actions before and after April 2002. On October 16, 2001, plaintiff received a written warning from Nell Johnson, Supervisor, for unsatisfactory work performance because a patient's room was not properly cleaned. (Exh. 5 to Hughes Dep.).

On April 18, 2002, plaintiff received a written warning from Alan Griffith, the Assistant Director of Hospital's Environmental Services Department, for unsatisfactory work performance as a result of an inspection of a patient's room for which plaintiff had cleaning responsibilities. (Exh. 7 to Hughes Dep.)

Alan Griffith issued a written warning to plaintiff on June 21, 2002, for unsatisfactory work performance for improper cleaning. (Exh. 8 to Hughes Dep.).

Larry Foye issued a 3 day suspension to plaintiff on June 21, 2002, for an incident involving another employee in the foundation office. The suspension form indicates that plaintiff refused to sign the form. (Exh. 9 to Hughes Dep.).

Alan Griffith documented a written complaint about plaintiff on or about July 19, 2002, indicating a room was not properly cleaned and that Dessie Wright was the person reporting the problem. The form is not signed by plaintiff. (Exh. 11 to Hughes Dep.).

Brown issued a disciplinary action against plaintiff on July 19, 2002, for unsatisfactory work performance. (Exh. 10 to Hughes Dep.). The notice states, in part: "I was called to sec Surg By The

Charge Nurs Shirley.  Reina Hughes Left Two room Friday Night.  The Patient in room 229 left at 15:10 and The Patient in 227 left at 14:50.  So I check with O.B. and L&D & Ped on Dishcarge.  Did not Do A ZA on 227 The room was Clean By Sarah."

Brown issued a disciplinary action against plaintiff on July 24, 2002, for insubordination stating, " On 7-24-02 Renina Hughes was page to L&D at 10: O'Clock  Renina Did not answer Her page, so I check the Parking Lot and Renina car was not ther and She Did Not Return." (Exh. 12 to Hughes Dep.).

Brown issued a disciplinary action against plaintiff on July 25, 2002, for unsatisfactory work performance stating, " On 7-24-02 at 9: oclock I call Reina Hughes to the office for counseling on her work performance.  After talken with her Reina then states that she was not coming to work on Thursday.  Then she left the premise and did not Return."  (Exh. 13 to Hughes Dep.).

Brown issued a written reprimand against plaintiff on March 17, 2003, for unsatisfactory work performance after inspecting several rooms and finding trash in the room and a blood stain on the wall.  (Exh. 16 to Hughes Dep.).

Alan Griffith issued a written warning on May 7, 2003, to plaintiff for unsatisfactory work performance, indicating rooms were improperly cleaned.  The form is signed by plaintiff.  (Exh. 17 to Hughes Dep.).

Alan Griffith issued a 3 day suspension to plaintiff on May 30, 2003, indicating rooms were not properly cleaned, plaintiff did not follow instructions and did not seem to care about her job performance.  The form was signed by plaintiff.  (Exh. 18 to Hughes Dep.).

Alan Griffith issued a written warning to plaintiff on June 21, 2003, indicating unsatisfactory work performance for not properly cleaning the area of the foundation office.  The form indicates

plaintiff refused to sign the form.  (Exh. 8 to Hughes Dep.).

Larry Foye, the director of the department in which plaintiff worked, testified that plaintiff's job performance was poor, that he counseled her on several occasions, and that he personally inspected rooms that were improperly cleaned by plaintiff.  (Foye Dep. at 10-11).

Joseph Frazier, assistant director of the department in which plaintiff worked and second shift supervisor, testified plaintiff's job performance was not consistent and her attitude was a little rebellious.  (Frazier Dep. at 7).  He first heard of allegations involving plaintiff and Brown from Mr. Foye who informed him that Brown and plaintiff were not to be in the same room together.  (Frazier Dep. at 14).

Hospital maintains Personnel Policies and Procedures[7] which contains an "Anti-Harassment Policy."  The Anti-Harassment Policy is designated as Section 4.3 H and provides a prohibition against, among other things, sexual discrimination and harassment.  The policy also provides a procedure for reporting a violation of the Anti-Harassment Policy, to include reporting a violation to a supervisor or higher level in an employee's "chain of command, to the Vice-President of Human Resources," or by telephone through a compliance hotline.     The policy requires that the person who receives the complaint complete a Harassment Report Form.  The Policies and Procedures and Corporate Compliance Manual requires that wrongdoing be reported to higher management.

Plaintiff received a copy of the policies and procedures at a new employee orientation on August 17, 2001.  The policies and procedures were also discussed at a new employee orientation on September 11, 2001. (Hughes Dep. at 28; Hyman Aff. at ¶6).  The Corporate Compliance Manual

---

[7] The Personnel Policies and Procedures are attached as Exhibit 3 to the Hughes deposition.

was also discussed at the September 11, 2001, orientation.  At the orientation, plaintiff signed a statement indicating that she understood that it was her responsibility to review the manual.  (Hyman Aff. ¶7 and Exh. B to Hospital's Memorandum in Support of Summary Judgment).  The manual advises the employee that the Hospital has an established Code of Conduct, that employees must comply with federal, state and local laws and regulations, as well as Personnel Policies and Procedures, and employees are expected to report any violations of law and regulations.  The manual also provides a detailed reporting process.

In conjunction with her August 2002 evaluation by Brown, plaintiff signed a certification indicating she understood that she had a duty to report any alleged violation of the Code of Conduct or Corporate Compliance Program, and that she was not aware of any violations.  She signed an identical form in conjunction with her annual evaluation from Joseph Frazier in August 2003.  (Exh. 19 to Hughes Dep.).

Plaintiff filed a Charge of Discrimination with the South Carolina Human Affairs Commission on or about November 13, 2003 which reads as follows:

> I.  PERSONAL HARM: (A) Through at or about October 1, 2003 and continuing, I have been subjected to a sexually hostile work environment, which included sexual harassment and intimidation.  (B) I was denied promotion/and/or hire as an entry contact person in the emergency room at or about June, August and October 2003.
>
> II. RESPONDENT'S REASON(S) FOR ADVERSE ACTION(S): (A) None given.  (B) None given.
>
> III. COMPLAINANT'S CONTENTION(S): (A) My supervisor, Mr. John Brown, continuously subjected me to verbal and physical sexual harassment for approximately 8 months.  I was employed as a housekeeper, and all of the discriminatory actions took place at the Respondent's premises.  I am a native of El Salvador, and believe that he perceived that he could exploit me because of my national origin.  When I eventually summoned the courage to

refuse to allow him to continue to sexually harass me, he began to trash the rooms both before and after I cleaned them.  I was subsequently written up several times for alleged poor job performance.  I believe Mr. Brown's intentions were to either force the Respondent to discharge me, or to force me to quit.  (B) I have applied in a proper and timely manner for 3 available positions for which I was qualified.  In each instance, a less qualified person was selected.

 IV.  DISCRIMINATION STATEMENT: I therefore believe that I was discriminated against on the basis of my sex (female/including sexual harassment), national origin (El Salvadoran), and in retaliation for my opposition to unlawful employment practices, in violations of the S.C. Human Affairs Law, as amended, and Title VII of the U.S. Civil Rights Act of 1964, as amended.

(Exh. 29 to Hughes Dep.).

Attached to the initial questionnaire submitted by plaintiff's attorney to the South Carolina Human Affairs Commission on or about October 21, 2003, is a statement of plaintiff signed October 17, 2003, which reads as follows:

My name is Reina Hughes.  I have directed my attorneys to prepare this statement, which is based entirely on my own statements given to them. . . .  I wish to file claims for sexual harassment, discrimination, retaliation, and non-sexual harassment against Conway Medical Center, . . ., due to the actions of Mr. John Brown and others within the company.

I am a 41 years old Hispanic female from El Salvador and have lived in the United States for 17 years.  Prior to leaving El Salvador, I witnessed many horrible events during the civil wars there, including mass murder, and I was raped on two occasions.  I am easily frightened, and often feel very intimidated, especially by men.  I am able to speak and understand English at a low level, and cannot read or write in English.  For this reason, it is difficult for me to find suitable employment and I feel that I have very few options, especially in a bad economy.  I was hired by Conway Medical Center as a housekeeper in August of 2001.  In approximately April of 2002, the harassment increased, and Mr. Brown began touching and rubbing me in an offensive manner.  This conduct was unwelcome, and not encouraged by me at all.  Around the same time, I was called into Mr. Brown's office.  In that meeting he told me we needed to "get closer."  By his manner, I understood he was seeking a sexual relationship, and it was made clear to me if I did not agree, "things would get bad" for me.  I was told not to tell anyone about the meeting, and Mr. Brown said he did not like people "in his business."  I was very frightened and intimidated by Mr. Brown.

-10-

Shortly after this meeting, against my wishes, I began a sexual relationship with Mr. Brown against my wishes. This relationship took place entirely at Conway Medical Center. I finally found the courage to end this relationship in October of 2002. Almost immediately thereafter, Mr. Brown began to make good on his threats to make things bad for me. The hospital rooms I was assigned to clean would be trashed, both before and after I had cleaned them. Trash was put all over rooms. Within a month of ending the relationship (around November 2002), I was suspended for poor job performance. My job performance had never been an issue prior to this. Approximately a month after that (December 2002), I was suspended again, then a third time a month later (January 2003). I have been a housekeeper basically my whole adult life, and I do not do a poor job. I believe Mr. Brown is trying to either force the hospital to fire me or make me quit.

From October of 2002 up to the present, Mr. Brown has continued to harass me verbally, made threats to me, continued to trash the rooms I have to clean, screamed at me in front of hospital visitors, etc. Other housekeepers whom I believe to be having consensual sexual relationships with Mr. Brown have helped him intimidate me. In early 2003, I got a new supervisor, Mr. Joseph Frazier, but Mr. Brown's harassment has continued right up until the present.

In July of 2003, I became aware I could file a complaint against Mr. Brown with the Hospital, which I did. On July 30, 2003, I received a letter from Mr. J. Craig Hyman, VP of Human Resources. In this letter, I was told the hospital had spoken to witnesses, including Mr. Brown, and there was no evidence of harassment; I was told not to enter into any room or area alone with Mr. Brown. Since then, Mr. Brown has entered rooms in which I was alone, although he is aware of the letter.

Because I am bilingual, I have applied three times (October 2003, and approximately August and June of 2003) for a position with the ER as a sort of entry contact person for the many Spanish speakers who use the hospital. Three different people have been hired over me.

I certify that the above statement is true, and is my own version of events as told to my attorneys.

(Exh. 28 to Hughes Dep.).

Hospital records indicate plaintiff applied for the position of Customer Service Representative in June 2003 and again in September 2003. (Hyman Aff. ¶20; Exh. 30 and 31 to Hughes Dep.). Plaintiff testified that someone else filled out the applications for her and she submitted them. (Hughes Dep. at 170-71). Although the Hospital does not have a record of it,

-11-

plaintiff testified that she submitted a third application that she herself filled out. (Hughes Dep. at 171).

The Customer Service Representative position required a high school diploma, communications skills dealing with the public, and the ability to operate a computer. (Exh. N to Hyman Aff.). Plaintiff testified that if she had been shown the qualifications, she would not have applied for the position because she did not meet the qualifications. (Hughes Dep. at 168-71,180-81; Exh. 1 to Hughes Dep.).

Debbie Earles, the Assistant Director of Patient Access, made the decision who to hire in the Customer Service Representative positions. At the time she made the decisions for the relevant positions, she was not aware that plaintiff made a complaint against Brown. (Earles Dep. at 12). Earles hired a woman the first time plaintiff applied, who was of the Asian race and from the Philippines. (Hyman Aff. ¶22).

### *Standard of Review*

Hospital files its motion pursuant to Rule 56, Fed.R.Civ.P. The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd.

v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." See also Celetex Corp. v. Catrett, 477 U.S. 317, 324 (1986)(Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves"). To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings. Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Celetex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

-13-

*Discussion*

In her Amended Complaint filed August 17, 2004, plaintiff alleges causes of action including (1) sexual harassment based on Brown's alleged inappropriate and unwelcome sexual behavior toward her and the Hospital's failure to take appropriate steps to stop the behavior resulting in a sexually hostile work environment, (2) retaliation against plaintiff for opposing Brown's alleged conduct, in the form of terms and conditions of her employment and rejecting her for promotion, (3) discrimination based upon national origin by rejecting her for promotion, (4) retaliation against plaintiff for opposing Brown's alleged conduct, in the form of failing to discipline Brown for his alleged conduct, allowing Brown to continue to harass her by trashing the rooms she was assigned to clean, and refusing to hire her for a customer service position. Plaintiff also alleges state law claims against Brown for assault, battery, intentional infliction of emotional distress, false imprisonment, and invasion of privacy.

In her memorandum in opposition to defendant's motion, plaintiff argues that her claim under a hostile environment theory based on "Brown's sexual harassment of Hughes continued, including trashing her rooms, his written disciplinary action on March 17, 2003, as well as paging her and asking her to 'come down to the laundry room again' after July 21, 2003. . . Also, at least two of Hughes' applications for jobs with the Hospital outside of John Brown's dominion and control were submitted and rejected within the applicable time period on June 6, 2003 and September 26, 2003, respectively", survives a Rule 56 analysis. (Plaintiff's Memorandum in Opposition at p. 9-10).

Defendant argues that many of plaintiff's allegations are time-barred, the hostile work environment claim is barred by the *Faragher/Ellerth* affirmative defense, and plaintiff cannot establish a claim of failure to promote.

-14-

*Failure to Promote Claims*

Plaintiff claims that she applied for and was rejected from the position of Customer Service Representative. She alleges that the rejection was due to her gender, national origin and retaliation. In order to prove a prima facie case of discrimination for failure to promote, she must prove that (1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. Taylor v. Virginia Union University, 193 F. 3d 219, 230 (4th Cir. 1999).

In her memorandum, plaintiff argues that she applied for two different positions, Customer Service Representative and Patient Assess position. Debra Shortt testified at deposition that she was the Employment Coordinator at Hospital. (Shortt Dep. at 4). She accepted plaintiff's application for a position in housekeeping and hired her. (Shortt Dep. at 6). She testified that plaintiff applied for a position of Patient Access Specialist on two occasions. (Shortt Dep. at 6). She testified plaintiff was not qualified for the position because she did not possess the necessary English skills or computer skills. (Shortt Dep. at 6). The qualifications for the position are "very good communications skills, good computer skills. They prefer people with medical terminology and an insurance background." (Shortt Dep. at 8). Shortt testified that she did not recall plaintiff applying for any other position. In an affidavit date June 9, 2005, Shortt states that she mistakenly named the position for which plaintiff applied as Patient Access Specialist when in fact it was Customer Service Representative. (Shortt Aff. ¶ 2). She states that plaintiff never applied for a position as Patient Access Specialist but only Customer Service Representative. (Shortt Aff. ¶ 2).

Shortt testified that she attempted to interview plaintiff after she first submitted an

application but she could not get in touch with her to conduct the interview.  (Shortt Dep. at 12-13).

Plaintiff testified that she was in New York for a few days when Shortt was attempting to contact

her.  (Hughes Dep. at 165).  Plaintiff testified that she applied a second time but was informed that

the application was lost so she applied for a third time.  (Hughes Dep. at 165).  She testified that she

applied for the position on three or four occasions.  (Hughes Dep. at 166).  The two applications in

Hospital's records indicate that she applied for a position as a Customer Service Representative in

the Patient Access Department.  (Exh. 30, 31 to Hughes Dep.).

        Plaintiff did not testify that she applied for more than one position, but that she applied for

one position on multiple occasions.  Hospital's records indicate that she applied on two occasions

for a Customer Service Representative position.  Patient Access Specialist is a position Shortt

testified to in her deposition and which does not appear on the applications submitted by plaintiff.

Shortt submits her affidavit indicating she misnamed the position for which plaintiff applied.  It is

clear from the record that the only position for which plaintiff applied was Customer Service

Representative.  The position required good communications skills and good computer skills.  It also

emphasized knowledge of medical terminology and an insurance background.  Plaintiff has failed

to present evidence that she was qualified for the position.

        Additionally, to the extent plaintiff's counsel argues in the opposition memorandum that

plaintiff applied for some other position, the record does not support the argument and plaintiff fails

to present an issue of fact as to another position for which plaintiff applied, the requisite

qualifications, and the qualifications possessed by plaintiff.  In other  words, to the extent plaintiff

claims she applied for a bilingual patient access or customer service position that included job

requirements that she possessed, she has failed to show that such a position existed and the requisite

-16-

qualifications.

Also, it is undisputed that the position of Customer Service Representative carried the qualifications of a high school diploma, good communication skills, and the ability to operate a computer. It is also undisputed that plaintiff did not possess these qualifications. In fact, in her deposition, plaintiff testified that had she known that the qualifications existed she would not have embarrassed herself by applying. (Hughes Dep. at 179-81). Plaintiff testified that she has a ninth grade education. (Hughes Dep. at 6). She testified that she may know "a little bit" about computers. (Hughes Dep. at 168).

Plaintiff was not qualified for the position of Customer Service Representative. Thus, she fails to meet the third element of a *prima facie* showing for a claim for failure to promote.

Additionally, plaintiff fails to present evidence, other than mere speculation and hearsay, indicating a causal connection between her failure to obtain a position as a Customer Service Representative and her gender, national origin or her complaint about Brown. Therefore, she fails to establish the fourth element of a *prima facie* case.

Accordingly, Hospital is entitled to summary judgment against plaintiff's claim for failure to promote based upon gender, national origin and retaliation.

### Hostile Environment Claim

To pursue this claim, plaintiff must have filed a complaint with the EEOC within 300 days of the incident. 42 U.S.C. § 2000e-5(e)(1). Incidents outside of the statutory window are time-barred unless they can be related to a timely incident as a "series of separate but related acts" amounting to a continuing violation. Beall v. Abbott Laboratories, 130 F.3d 614 (4th Cir. 1997)(citing Jenkins v. Home Ins. Co., 635 F.2d 310, 312 (4th Cir.1980) (per curiam)). Incidents

involving a hostile work environment often involve similar type of conduct, occur relatively frequently, and are perpetrated by the same person. National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 120 (2002). As long as one act that contributes to the claim fails within the statutory period, the entire hostile period may be considered in determining liability. Id. at 117-18.

Defendant asserts that Hughes filed her administrative charge on November 13, 2003, and, therefore, any discriminatory act occurring before February 17, 2003 is time-barred.

Plaintiff argues that she submitted an unverified claim on October 21, 2003, and thus, the verified claim filed on November 13, 2003, relates back to the earlier filing of the unverified claim. She also argues that Brown engaged in sexual harassment within the applicable time period when he trashed her rooms, when he issued a written disciplinary action on March 17, 2003, and when he paged her to "come down to the laundry room again" after July 21, 2003.

Plaintiff fails to present any precedent supporting her argument that the Charge of Discrimination relates back to the date of the filing of the unverified claim and the undersigned has not discovered a case supporting this argument. In fact, the unverified complaint form states in its heading "COMPLETION AND SUBMISSION OF THIS QUESTIONNARIRE DOES NOT IMPLY OR CONSTITUTE THE FILING OF A CHARGE." (Hughes Dep. Exh. 28). Plaintiff's argument is without merit. The limitations period excludes conduct occurring prior to February 17, 2003, unless the conduct is part of a continuing violation theory.

Plaintiff presents several acts which are within the limitations period, to wit: (1) Brown took disciplinary action against her on March 17, 2003; (2) Brown paged her and asked her to "come to the laundry room again", in January 2004; (3) rooms she cleaned or was responsible for cleaning were "trashed;" and (4) the rejection of her applications for promotion.

-18-

Plaintiff claims that her rooms were "trashed." Plaintiff claims that Brown was involved and testified that she speculated that she was being "set up" by Sarah, Joe-Rita and Jean Fleming. (Hughes Dep. at 77-86, 91,185). The only evidence that plaintiff submits to support her allegation that Sarah, Joe-Rita or Jean Fleming intentionally trashed the rooms she was responsible for cleaning is her own, self-serving, speculation unsupported by the record. This is insufficient to defeat a motion under Rule 56. Williams v. Cerberonics, Inc., 871 F. 2d 452, 455 (4th Cir. 1989).

She testified that Sarah, Joe-Rita, and Joan Fleming were friends with Brown and maintained ill-will towards her. (Plaint. Dep. At 79-84, 132). Although the allegations in her complaint allege that Brown told her if she did not agree to have sex "things will get bad," there is no evidence to support this assertion. Plaintiff testified that "I felt like if I not have sex with him he will get his way to get - to get me fired." (Plaint. Dep. At 57-58).

To accept plaintiff's argument would require a reasonable juror to make unreasonable conclusions. It is undisputed that the room plaintiff was responsible for cleaning on March 17, 2003, was not clean. Therefore, it must be assumed that the condition of the room was altered after plaintiff cleaned it. One would further have to conclude that it was Sarah, Joe-Rita or Jean Fleming were involved in the alteration of the condition of the room. Additionally, one would have to conclude that they altered the room's condition based upon their friendship with Brown if not upon Brown's request. This was not an isolated occasion. Plaintiff received written warnings for similar conduct on several occasions between October 2001 and April 2003. If any circumstantial evidence exists to connect the components of her argument, it is less than a scintilla and no reasonable juror could make such a conclusion based upon the evidence presented. Additionally, assuming Sarah, Joe-Rita, or Jean Fleming did "trash" the room on this or any other occasion, this does not involve

similar conduct to that alleged of Brown and it was not perpetrated by Brown.

The decisions in June and September 2003 to select individuals other than plaintiff to fill the customer service positions were discrete acts made solely by Debbie Earles with no relation to the sexual conduct allegedly occurring between Brown and Hughes in 2002. Plaintiff fails to show a relationship between the alleged actions of Brown and the rejection of her applications for a customer service representative position. The denials amount to discrete acts unrelated to the alleged hostile work environment.

The next claim is that Brown paged her in January 2004 to meet him in the laundry room. Plaintiff asserts that she stopped the sexual relationship in October 2002. Thus, this paging incident occurred approximately fifteen months later. Clearly this involves the same type of conduct and the same perpetrator. However, a fifteen month lapse of time does not present a frequent occurrence. While this lapse of time is troublesome[8], it is consistent with the same prior conduct of Brown and involves separate but related acts under the circumstances.

However, the following passage from <u>Morgan</u> may make the determination in this case different. The passage is as follows:

> The following scenarios illustrate our point: (1) Acts on days 1-400 create a hostile work environment. The employee files the charge on day 401. Can the employee recover for that part of the hostile work environment that occurred in the first 100 days? (2) Acts contribute to a hostile work environment on days 1-100 and on day 401, but there are no acts between 101-400. Can the act occurring on day 401 pull the other acts in for the purposes of liability? In truth, all other things equal, there is little difference between the two scenarios as a hostile environment constitutes one "unlawful employment practice" and it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole. Nor, if sufficient activity occurred by day 100 to make out a claim, does not matter

---

[8] Defendant does not assert a defense based upon laches. See <u>Morgan</u>, 536 U.S. at 121.

> that the employee knows on that day that an actionable claim happened; on day 401 all incidents are still part of the same claim. **On the other hand, if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act.**

Morgan, 536 U.S. at 118 (Emphasis added).

Although this is dicta, it appears that the Supreme Court is recognizing that certain actions taken by the employer can insulate it from liability based on the same hostile environment claim. Before a conclusion is reached, defendant's anti-harassment policy defense will be discussed.

**Faragher/Ellerth Affirmative Defense**

A defendant may escape liability for sexual harassment as a matter of law if it can show (1) it exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998) and Burlington Industries, Inc. V. Ellerth, 524 U.S. 742, 764-65 (1998)

Evidence that the employer maintained an effective anti-harassment policy or that employee failed to take advantage of such a policy is compelling proof of the *Faragher/Ellerth* defense. Lissou v. South Food Serv., Inc., 159 F.3d 177, (4th Cir. 1998). This defense is available against claims involving harassment that does not involve discriminatory tangible employment action.[9] Burlington Industries, 524 U.S. at 753; Lissou, 159 F.3d at 182.

Plaintiff claims that the ani-harassment policy was ineffective for her because she could not read and write English very well. (Hughes Dep. at 25). She also claims that because the policy did

---

[9] Plaintiff does not dispute that this case does not involve a tangible employment action.

not require her supervisor to forward any complaints to a higher authority, the policy is dysfunctional. Also, plaintiff maintains that an issue of fact exists as to whether Hospital took prompt remedial action to end the harassment. Additionally, plaintiff argues that she took advantage of the preventive and corrective opportunities provided by Hospital but the harassment continued, stating that Brown continued to ask for sex and page her frequently after she complained.

As set forth in the "Facts" above, Hospital maintained an effective, written anti-harassment policy. Plaintiff's argument that the policy was dysfunctional on its face is without merit. Plaintiff argues, however, that she was unable to take advantage of the anti-harassment policy because she was unable to read and understand it. Specifically, she testified as follows:

> Q: Do you remember discussing some of the policies that are in these personnel policies and procedures booklet?
> A: This is a big book. I – I can not read this.
> Q: You can't read it because its big?
> A: In there are a lot of big words. I can sign the paper, yes I've received the book but it don't mean I understand and read it myself.

(Hughes Dep. at 25).

However, when asked to read the "Job Summary" for the Customer Service Representative job description, plaintiff read as follows:

> The Customer Service Representative (CSR) is responsible for assisting patients, family members, or other visitors that come to the Emergency Room Registration Area. The CSR will direct all patients and visitors to the appropriate room – department or point of registration. The CSR will notify triage nurse when an emergency patient has arrived. Renders service to neote (sic) pediatric, adolescent, adult, and generic – and geri – I cannot pronounce the name – patients.

(Hughes Dep. at 179). Additionally, she testified she possessed a 9th grade education (Plaint. Dep. At 6); that she read and understood the Application for Employment, the Terms of Employment

-22-

Notice (Plaint. Dep. At 6, 21-22), and her statement filed with SHAC (Plaint. Dep.at 150); and that she could read and write English (Plaint. Dep at 168).

Whether or not plaintiff has mastered reading English, she clearly is able to read.  A need to determine which version of plaintiff's testimony should be believed does not create an issue of fact.  Waste Management Holdings, Inc. v. Gilmore, 252 F.3d 316, 341 (4th Cir. 2001).  Also, plaintiff signed a statement indicating that she had read and understood the policies.[10]  Also, there is no dispute that the Policies and Procedures were discussed at her orientation in 2001, and that she received a copy.  (Plaint. Dep at 24-25).  Defendant's anti-harassment policy is not rendered ineffective due to plaintiff's inability, or limited ability, to read English.

Plaintiff also claims that the anti-harassment policy was not effective because she reported the situation to her supervisor[11], Frazier[12], who failed to take interest.   In the light most favorable to the plaintiff, she did complain to Frazier up to a month prior to Foye approaching her.  Frazier denies plaintiff complained to him.  There was no written report prepared by, or other report to higher authority from, Frazier.  This does not render the anti-harassment policy facially ineffective because if Frazier did not prepare or submit a report, he failed to perform his duties and to follow policy.  Thus, does Frazier's failure to comply with defendant's policies render defendant's actions

---

[10]  The law in South Carolina is that a person is presumed to understand a document that she signs.  Burwell v. South Carolina Nat'l Bank, 340 S.E.2d 786, 789 (S.C. 1986).

[11]  Plaintiff testified that she informed David Russell of her alleged sexual relationship with Brown during the time the sexual encounters were taking place.  She testified that she informed Mary and Gertrude Smith approximately one month before she informed Hyman of the situation.  Russell, Mary and Smith were all non-management, co-workers of plaintiff.

[12]  Plaintiff testitified that she did not request Frazier to take any action.  (Plaint. Dep. At 104).

deficient for purposes of the *Ellerth/Faragher* defense? It does not seem appropriate to consider Frazier's inaction in a vacuum. There is no evidence that any harassment occurred between the time plaintiff complained to Frazier and when Foye approached her. Foye approached plaintiff "about the same time", "within a month" of her conversation with Frazier. Foye testified that he approached plaintiff after hearing a rumor involving Brown and plaintiff.[13] It is undisputed that Hyman and Foye met with plaintiff, conducted an investigation into the allegations, prepared a written report, took remedial action consistent with the letters to plaintiff and Brown, permanently assigned Brown to another shift, and that no sexual contact occurred after the remedial action was taken. Under the circumstances, defendant's actions and policy were reasonable and effective regardless of Frazier's inaction.

It is undisputed that if any inappropriate conduct occurred after July 2003, plaintiff did not inform Hyman, Foye, or other appropriate person of its occurrence. Additionally, by January 2004, plaintiff was represented by counsel and had filed a Charge of Discrimination. Clearly, she knew who to contact at that point. Defendant's actions after Foye and Hyman met with plaintiff on July 23, 2003, were effective and satisfy the *Ellerth/Faragher* standard. As set forth by Judge Norton in Talamantes v. Berkeley County School Dist., 340 F.Supp.2d 684 (D.S.C. 2004),

> The law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists. Brown v. Perry, 184 F.3d 388, 397 (4th Cir. 1999). The law requires an employer to be reasonable, not clairvoyant or omnipotent. Id. Evidence that the plaintiff failed to utilize the company's complaint procedure will normally suffice to satisfy the company's burden under the second element of the affirmative defense. Matvia v. Bald Head Island Management, Inc., 259 F.3d 261,

---

[13] The record does not disclose the circumstances under which or from whom Foye heard the "rumor."

-24-

> 269(4th Cir. 2001)(quoting <u>Barrett v. Applied Radiant Energy Corp.</u>, 240
> F.3d 262, 267 (4thcir. 2001)).  Nor will a generalized fear of retaliation or "an
> employee's subjective belief in the futility of reporting a harasser's behavior
> constitute a reasonable basis for failing to take advantage of any preventive
> or corrective opportunities provided by the employer.  <u>Barrett</u>, 240 F.3d at
> 267-68.

<u>Id</u>. at 698(internal quotations omitted).  Plaintiff admits that she did not report her allegations to anyone after July 2003.

As to the second prong – that plaintiff unreasonably failed to take advantage of the policy –, there is evidence from Ms. Earles that plaintiff's ability to read and write in English was with some limitation; however, as discussed above, the evidence clearly shows that plaintiff can read English. A review of the policy, other than the thickness of the book, does not present a significantly difficult read.  The policy was in place and she was made aware of its existence.  It was not reasonable for her not to timely take advantage of the policy.  To the extent any inappropriate conduct occurred after she made her complaint, she did not report the conduct as instructed.  Furthermore, part of the action taken by defendant was to direct both Brown and plaintiff to not enter a room alone with the other.  Upon being paged by Brown, plaintiff followed this directive.  Also, the evidence reveals that plaintiff reported her complaints to her supervisor and the Human Resources Department, both consistent with the procedure contained within the anti-harassment policy.  Plaintiff fails to create a genuine issue of material fact as to the reasonableness of her failure to take advantage of the anti-harassment policy.

Therefore, the *Ellerth/Faragher* defense is applicable.  As well, this brings us back to the continuing violation theory.  It appears since defendant's actions satisfy the first prong of the *Ellerth/Faragher* defense, she obtained counsel and a formal charge was filed in the interim and

because plaintiff failed to take advantage of the ani-harassment policy, the <u>Morgan</u> exception would apply. In other words, the intervening action of defendant renders the conduct of Brown in January 2004 separate from any hostile environment claim in existence prior to July 2003.

Accordingly, plaintiff fails to present a continuing violation and, assuming *arguendo*, a valid continuing violation, Hospital is entitled to summary judgment pursuant to the *Ellerth/Faragher* defense.

Plaintiff's remaining claims are against Brown under state law. The court can decline to continue an action as to pendent state law claims if the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. §1367(c). Dismissal is appropriate in this case.

For the foregoing reasons, it is recommended that defendant's motion for summary judgment be granted. Accordingly, the case against Conway Hospital should be dismissed. Additionally, the court should decline to retain jurisdiction over plaintiff's remaining claims which are against Defendant Brown and brought under state law.

February 28, 2006                              s/Thomas E. Rogers, III
Florence, South Carolina                       Thomas E. Rogers, III
                                               United States Magistrate Judge

**The parties' attention is directed to the important notice contained on the following page(s)**

-26-

### Notice of Right to File Objections to Magistrate Judge's "Report and Recommendation"
### &
### The Serious Consequences of a Failure to Do So

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of service. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. *See* Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410, 1993 U.S.Dist. LEXIS® 3411 (D.S.C. 1993).

During the ten-day period for filing objections, but not thereafter, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he or she wishes the United States District Judge to consider any objections. Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections. *See* Keeler v. Pea, 782 F. Supp. 42, 43-44, 1992 U.S.Dist. LEXIS® 8250 (D.S.C. 1992); and Oliverson v. West Valley City, 875 F. Supp. 1465, 1467, 1995 U.S.Dist. LEXIS® 776 (D.Utah 1995). Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. *See* United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied,* Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-847 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he or she did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. Howard v. Secretary of HHS, 932 F.2d 505, 508-509, 1991 U.S.App. LEXIS® 8487 (6th Cir. 1991). *See also* Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied,* 474 U.S. 1009 (1985). In Howard, supra, the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* Lockert v. Faulkner, 843 F.2d 1015, 1017-1019 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

*See also* Branch v. Martin, 886 F.2d 1043, 1046, 1989 U.S.App. LEXIS® 15,084 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the plaintiff of the consequences of a failure to file specific, written objections. *See* Wright v. Collins, supra; and Small v. Secretary of HHS, 892 F.2d 15, 16, 1989 U.S.App. LEXIS® 19,302 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections addressed as follows:

**Larry W. Propes, Clerk**
**United States District Court**
**Post Office Box 2317**
**Florence, South Carolina 29503**

-27-